ANJULIA WILLIAMS, Appellee, v. PETER FAHN, Appellant.

Marriage Contract: ANNULMENT. Where either of the parties to
1 a marriage contract discovers the other to be of immoral character he may annul the same.

Bad Character: PROOF OF: SPECIFIC ACTS. In an action for
2 breach of marriage contract, where defendant pleads bad character, which was unknown at the time of contract, proof of specific acts of immorality is unnecessary.

Evidence: Evidence in a suit for breach of marriage contract contract considered and held to support a verdict for plaintiff.
3

*Appeal from Shelby District Court.*—HON. W. R. GREEN, Judge.

THURSDAY, APRIL 9, 1903.

ACTION at law to recover damages on account of breach of marriage contract. There was trial to jury, and verdict and judgment for plaintiff. Defendant appeals.—*Affirmed.*

*T. R. Mockler* for appellant.

*Lindt & Mynster* and *Cullison & Robinson* for appellee.

BISHOP, C. J.—Peter Fahn lives at Earling, in Shelby county. He is a widower, is seventy-four years of age, and alleged to be wealthy. Anjulia Williams also lived at Earling at the time of the occurrences in question. She is forty-five years of age, has never been married, and is deaf and dumb. She lived with her mother, and for a time the mother and daughter had been engaged in the performance of some form of domestic service for the appellant. That the appellant, Peter, was impressionable, is admitted; likewise, that he was not immune. It is said, in effect, that the festive god spread his net, and Peter at once became entangled in its meshes. It is certain, in any event, that he proposed marriage to Anjulia, and that she yielded, and gave him her promise true. All these matters he frankly admits, and, as he is the only defendant in the case, an intrusive inquiry into the details is unnecessary, would be unwarranted, and we forbear. A day or two later, Peter, in company with a prospective brother-in-law, went to the county seat and procured a marriage license. Upon his return to Earling, he called for Anjulia, and together they went unattended to the home of the resident Catholic priest, who was requested to marry them. It seems that the priest was stony-hearted, but sensible; lacking in all touch of romance, but abounding in good judgment. He refused. Nay, more; he hesitated not to call Peter an old fool, and Anjulia something worse. A moment later, they left his door as they came—the man, with hot words of advice, strongly punctuated, ringing in his ears; and the women, in her affliction, conscious only that for some unexplained reason, to use a familiar figure of speech, there had occurred a slip " 'twixt the cup and the lip." Peter took Anjulia back to her home, where he left her surrounded by her relatives and friends. He then

went to a near-by place of public resort to reflect. His friends came, and, it appears, attempted to assuage his disappointment by making many damaging statements to him respecting the moral character of Anjulia. Some of them went so far even as to charge that both she and her mother were common prostitutes, and were then engaged in keeping a house of prostitution. Peter went out, and, in respect of his immediate doings, the evidence goes no farther than to show that he went at once to his home, tearless but resolved. He never returned to the side of Anjulia, except to say that he would not marry her, and this action was brought in consequence of the position so taken by him.

Two matters only of defense are set up which require consideration at our hands: First, that after the engagement contract defendant discovered that plaintiff was a woman of bad character and reputation for chastity and morality; second, that after the happening of the matters complained of, and before the bringing of this action, he made a full and complete settlement with plaintiff.

It is correct doctrine, most certainly, that where a man discovers after entering into a contract for marriage —the rule is the same, of course, the parties being reversed 1. MARRIAGE —that his fiancee is a woman of unchaste and contract: annullment. immoral character, he may, at his election, renounce the contract, and may plead such fact in justification of his conduct in any court of law or equity. The principle involved is akin to that upon which the doctrine of implied warranty rests.

It is said further that the rule is not weighted down by any requirement to the effect that specific proof must be made of specific acts of unchastity. It is sufficient if the 2, BAD charac- woman is shown to be of bad character at the ter: proof of specific acts. time of the contract, and that this was unknown to the defendant. Such being the facts, he may sever the relation with impunity. It is manifest that to

such cases the doctrine of *caveat emptor* can have no application. That we correctly state the rules of law applicable, surely no man will question, and there will be none to require a citation of authorities.

Now, if the tesimony of the witnesses for the defendant in this case is to be believed, Anjulia was not in all respects pure in heart and clean of body; she had not kept herself unsoiled or unspotted from the world. On the other hand, the witnesses called on her behalf speak of her as chaste in character, fair of name, and fair of fame. Concerning the question of defendant's knowledge at the time the contract was entered into respecting the moral character of plaintiff, we think it sufficient to say, without bringing forward the details, that the evidence relating to the situation of the parties is sufficient to warrant a finding that defendant had looked and listened, and that, in a general way, at least, he acted advisedly. From the facts disclosed by the record, it appears that he was more or less acquainted with her past life and career; he knew much of her surroundings and of her habits; he was also more or less intimately acquainted with her associates, male as well as female, some of whom—and it is the least that can be said—were themselves afflicted with very delicate reputations. We are not called upon to consider how far excuse may be made for one who is shown to have been under the spell and influence of the divine passion at the time of the contract to such an extent that reason is no longer able to remain on guard for the protection of his just rights, the while his five senses—the endowments of nature as weapons of defense and of offense—combine together to work his undoing. Such an issue is not directly presented by the pleadings, or made the subject of argument by counsel. The whole matter of the defense, as presented, was submitted under proper instructions to the jury, whose exclusive province it was to fix upon and declare the ultimate

3. EVIDENCE.

facts. We cannot say that the conclusion reached was so far unwarranted as to justify us in disturbing the verdict.

It is unnecessary that we rehearse the facts connected with the alleged settlement. It is sufficient to say that there was some evidence tending to prove that a small sum of money, which admittedly had been paid by defendant to plaintiff, was accepted by her with the understanding that it was a simple gift, and intended to enable her to move out of the town. The jury found such to be the fact, and we will not interefere with the finding.

We have examined the many assignments of error based upon rulings in connection with the introduction of evidence and upon the instructions given by the court to the jury. We discover no prejudicial error.

While it is true that the record presents much upon which persuasive arguments are easily built up in favor of the several positions taken by each of the parties, yet all such matters were incidental to the presentation of the case to the jury. Twelve good men and true have looked upon Peter and upon Anjulia, and have solemnly and with unanimity declared the matters of defense to be without merit. By the verdict it is also conclusively settled that damage was actually done to the feelings and the prospects of plaintiff, and that the monetary value thereof was the sum of $1,500; that the defendant, having repudiated his contract, and being without lawful excuse for his heartless conduct, resulting in the distress, physical and mental, and the heart repinings of plaintiff, should accordingly pay the equivalent thereof in money, the amount of which is fixed by the verdict. There appearing to be no error in the record, we refuse to disturb the judgment entered upon such verdict.—AFFIRMED.